HARVARD LAW LIBRARY

*Fairfield,*
June, 1843.

Ayres
*v.*
Husted.

## Ayres *against* Husted and others.

*B, D* and *E,* creditors of *C,* having successively, and in the present order of their names, attached *C's* personal property, it was, in pursuance of an agreement between them, placed in *A's* hands, to be by him sold, and the proceeds to be applied to the judgments to be recovered by the attaching creditors, in the same manner as they would, by law be applied, in the ordinary course of proceeding. The property was accordingly sold, and the proceeds placed in *A's* hands. The creditors severally obtained judgments in the attachment suits. Those in favour of *D* and *E* were admitted to be unexceptionable; but they claimed, that *B's* was fraudulent and void. His judgment was obtained on a note for 1125 dollars, payable on demand, which he had taken of *C,* partly for a preëxisting debt, and partly to secure *B* for his indorsement of a note for the accommodation of *C,* which was negotiated and not due, with an understanding between *B* and *C,* that *B* should immediately attach, in a suit on the note so taken, all the property of *C,* and if *B* could find property sufficient to secure, in addition to his own claims, an outstanding note due by *C* to *F., B* should assume the payment of that note, and the amount should be allowed on the note given by *C* to *B.* The attachment of *B* was then levied. This arrangement between *B* and *C* was without any fraudulent intent, on the part of either; but there was no agreement by *B* to pay the note he had so indorsed for *C;* nor was *C* in any way exonerated from the payment thereof. Held, 1. that the consideration of the note so given by *C* to *B* and of the judgment founded thereon, was divisible; and that the judgment, so far as it embraced *C's* indebtedness to *B,* was valid; but for that part which consisted of *B's* liability as indorser for *C,* the judgment, as against the subsequent attaching creditors, was invalid; 2. that the provisional arrangement for securing the amount of *C's* note to *F.,* not being included in *B's* judgment, did not render such judgment void, either as within the original statute against fraudulent conveyances, or the additional act of 1828.

Though where one creditor has security on two funds of his debtor, and another creditor has security for his debt on only one of these funds, the latter has a right in equity to compel the former to resort to the other fund, if it is necessary for the satisfaction of both creditors, provided it will not prejudice the rights or interests of the party entitled to both funds, nor do injustice to the common debtor, nor operate inequitably on the interests of other persons; yet this doctrine prevails only where the parties seeking aid are creditors of the same common debtor, and have demands against funds the property of the same person.

Therefore, where *C* and his wife conveyed to *B* the equity of redemption in her land, to be applied in payment of certain claims of *B* against *C,* which were previously secured in part, by attachment of *C's* personal property, on which *D* and *E,* other creditors of *C,* had also liens by subsequent attachments—the residue of such equity of redemption to be applied in payment of a debt due from *C* to his daughter, and the balance, if any, to be paid to *J.,* another creditor of *C;* on the claim of *D* and *E,* that *B* should be compelled, for their benefit, to resort, for the satisfaction of his claims, to such equity of redemption, before he proceeded against the property attached; it was held, that such claim of *D* and *E* was inadmissible; as the property constituting

the two funds did not wholly belong to *C*, but the land belonged to his wife, and was conveyed only as collateral security, and specifically for the benefit of other creditors, whose equity was equal to that of *D* and *E*.

THIS was a bill of interpleader. The case was as follows.

On the 20th of *April*, 1841, *Abraham Crissey* was indebted to *Thomas S. Husted*, one of the defendants, upon a promissory note, payable to him, on demand, in the sum of 137 dollars, 50 cents, and on book, in the further sum of 489 dollars, 75 cents, for two parcels of leather sold by *Husted* to *Crissey*, in the months of *January* and *February*, 1841 ; against which was a credit on book in favour of *Crissey*, for 33 dollars, 51 cents. At the time when the leather was sold to *Crissey*, nothing was said by the parties, as to the time of payment ; but there had been previous dealings between them in the same article, and the usual credit allowed was from four to six months. Before the 20th of *April*, 1841, *Husted* had indorsed for *Crissey* a promissory note, made by *Crissey*, payable to *Husted*, or order, at the *Fairfield County Bank*, for 180 dollars, and had also indorsed sundry other notes for *Crissey*, made by different individuals, amounting in the whole to about 1000 dollars. All these notes so indorsed by *Husted*, had been discounted at banks, for the benefit of *Crissey*, and were then outstanding, and had not arrived at maturity. *Crissey* was, at the same time, indebted to the other defendants, severally ; and to divers other individuals, to a large amount ; and particularly to *Benjamin Slosson*, in the sum of 68 dollars, 74 cents, by note, which had been indorsed by *Slosson*, to the *Fairfield County Bank*, and had not then arrived at maturity.

*Crissey* being, at that time, insolvent, and upon the eve of failure, *Husted* went to the city of *New-York*, where he (*Crissey*) then was, for the purpose of obtaining security from him for his indebtedness to *Husted*, and also for *Husted's* liabilities for *Crissey* as indorser. To secure *Husted* on account of such indebtedness and liabilities, *Crissey* gave his promissory note to *Husted*, for the sum of 1125 dollars, payable on demand, with interest, and bearing date at *New-Canaan*, 10th of *February*, 1841. The note so given was greater than the amount of *Crissey's* indebtedness to *Husted*, but less than the amount of *Crissey's* indebtedness and *Husted's* liabilities on his account ; and as it was not then known what amount

of such liabilities *Husted* might be compelled to pay, it was agreed between him and *Crissey*, that after the notes indorsed by *Crissey* had arrived at maturity, the amount of *Crissey's* indebtedness to him should be ascertained, and the note of 1125 dollars should be indorsed down so as to leave nothing more due upon it than *Crissey* should owe him on account of said indebtedness and liabilities. It was the understanding of these parties, that upon *Husted's* return to *Connecticut*, he should commence a suit upon said note, and cause all *Crissey's* property to be attached thereon. It was further agreed between them, that if *Husted* could find property sufficient to secure him and pay the note to *Slosson*, *Husted* was to assume the payment of that note, and the amount thereof was to be allowed on the note of 1125 dollars. The reason assigned for making the note bear date at *New-Canaan*, on the 10th of *February*, 1841, was, that it might bear date as near the time when the leather was sold, as the parties could make it.

After *Husted's* return to *Connecticut*, he, on the 22nd of *April*, 1841, commenced a suit on said note of 1125 dollars against *Crissey*, and caused all his real and personal estate in *Connecticut* to be attached. Afterwards, on the same day, *S. Raymond & Co.* caused the same estate to be attached in a suit on their claim. After this, and on the same day, *Bowton* attached the same estate on his claims. At the term of the county court held in *August*, 1841, the plaintiffs in these suits recovered judgments against *Crissey* for the amount of their respective claims. The amount of the judgment in favour of *Husted*, including debt and costs, was 831 dollars, 71 cents; that in favour of *S. Raymond & Co.* was 172 dollars, 49 cents; and the two judgments in favour of *Bowton* amounted to 487 dollars, 91 cents.

After the notes indorsed by *Husted* for *Crissey* had arrived at maturity, they met and adjusted the indebtedness of *Crissey* to *Husted*, and indorsed upon the note of 1125 dollars the sum of 334 dollars, 79 cents, as received *February* 10th, 1841, leaving still due upon said note the sum of 790 dollars, 21 cents, with interest from that time. The balance thus left due upon such note embraced only the note of 137 dollars, 50 cents, with the interest thereon; the balance due *Husted* on book, after deducting from his charges of 489 dollars, 75

cents, the credit of 33 dollars, 51 cents ; and the amount of said note of 180 dollars, which *Husted*, after the attachment, had been compelled to pay. It did not appear, that *Husted*, in obtaining the note of 1125 dollars, had any other intention than that of securing himself for the indebtedness of *Crissey* to him, and his liabilities for *Crissey*.

On the 8th of *May*, 1841, after the personal property of *Crissey* had been so attached, and while it remained in the hands of the officer who attached it, *Crissey* and the attaching creditors, being desirous of having the property sold to the best advantage for their benefit, executed and delivered to the plaintiff a written contract, by which they agreed, that the plaintiff should sell and dispose of all the personal property of *Crissey* so attached, which might be deemed perishable, or which might cause expense, by being kept until after judgments could be obtained ; that the avails of such sales should be kept by the plaintiff, and should stand in the same relation to the attaching creditors as the property would, if it had remained unsold until the several suits were terminated. And they also agreed to indemnify the attaching officer for the delivery of any such articles to the plaintiff ; authorizing him to sell them at auction for approved endorsed notes, at four months ; and declaring, that by so doing, he should not be held responsible, in case such notes should not prove good, if, before taking them, he consulted the creditors, and they approved of such notes.

On the 17th of *May*, 1841, the plaintiff, in pursuance of this contract, by direction of *Crissey* and the attaching creditors, sold at public auction all the personal property attached, for 720 dollars, 27 cents ; and he is justly entitled to retain from that sum, for his services and expenses, 45 dollars, 93 cents. On the 20th of *May*, 1841, he paid over to *Husted* 384 dollars, 61 cents, in part payment of his debt against *Crissey ;* and the balance of the money arising from such sales, amounting to 289 dollars, 73 cents, he paid to the clerk of the superior court, subject to the decree to be made in this case.

After judgments had been rendered in said suits against *Crissey*, and within sixty days thereafter, *S. Raymond & Co.* and *Bowton* took out executions upon the judgments in their favour respectively, and caused a legal demand to be made of the plaintiff, by a proper officer, for so much money arising

HARVARD LAW LIBRARY

*Fairfield,*
June, 1843.

Ayres
*v.*
Husted.

from the sale of the property attached as would be necessary to satisfy such judgments and the costs.

On the 26th of *April,* 1841, *Ellis A. Crissey,* the wife of said *Abraham Crissey,* being seised in fee of two pieces of land in *New-Canaan,* with the buildings thereon, she, with her husband, by a release deed of that date, conveyed to said *Husted* all their right, title and interest in said land and buildings, upon the following agreement in writing, made and delivered by *Husted* to them : " Whereas *Abraham Crissey* and *Ellis A. Crissey,* his wife, have, this day, given me a quit-claim deed of two certain pieces of land situated in said *New-Canaan,* for a description of which reference is given to said deed, in consideration of which, I hereby agree to sell said property to the best advantage, and out of the avails thereof, in the first place, to retain for myself whatever balance may be due me, on account of a note which I hold against said *Crissey,* and on which I have attached property ; and also what balance may be due me in consequence of any notes which I have indorsed for said *Abraham Crissey,* or on any such notes as I may indorse, as renewals of said notes ; in the next place, to pay to *Abigail E. Crissey* 100 dollars, which I have obligated myself to pay ; and then to pay over to *Jonathan K. Johnson* and *Darius S. Ayres,* partners in company under the firm of *Johnson & Ayres,* all the balance of the avails of said lands, and also all the surplus that may be in my hands from the above attached property, after satisfying the above named note.    [Signed.]    *Thomas S. Husted."*

At the time of the execution of said quit-claim deed, there were two mortgages upon the premises, upon which there is now due about 900 dollars ; and the interest conveyed to *Husted* was only the equity of redemption in the premises. The whole value of the premises is 1600 dollars.

The debt due to *Johnson & Ayres,* was, at the time of the conveyance, and still is, of greater amount than the whole of the premises.

Mrs. *Crissey* having an interest in the premises, which was not liable to be attached or taken for the debts of her husband, refused to execute said conveyance, unless her daughter *Abigail* could be paid a debt due to her from her father of 100 dollars ; and in order to obtain such conveyance, *Husted,*

became obligated to pay that sum to her, and soon after actually paid it.

The interest of *Crissey* in the real estate attached by the defendants in this suit, was his life estate in the lands and buildings so conveyed, and nothing more; and this subject to the liens acquired by the attachments.

On the 22nd of *September*, 1841, *Crissey* and his wife executed and delivered to *Johnson & Ayres* a warranty deed of said lands and buildings.    *Husted*, by reason of the incumbrances of said real estate so conveyed to him, being unable to sell it, unless he would give a warranty deed thereof, which he declined doing, afterwards, on the 27th of *November,* 1841, had his execution duly levied upon all *Crissey's* interest in said real estate ; which was set off to him, at the sum of 197 dollars, 37, cents, exclusive of the expenses of levying the execution; which sum was applied in part payment of *Husted's* judgment.    No sale has ever been made by him of said real estate.

After the levy of *Husted's* execution, *Bowton* caused his execution, issued upon the judgment in his favour for 364 dollars, 45 cents, to be levied upon said real estate, as the property of *Crissey*, subject to said two mortgages, and *Crissey's* life estate so set off to *Husted*, and caused such real estate to be appraised and set off to him, (*Bowton*) in full satisfaction of his execution.    But it was not found, that he, by virtue of said levy, acquired any interest in said real estate.

The question as to what decree should be passed, in this case, upon the foregoing facts, was reserved for the consideration and advice of this court.

*Bissell* and *Butler*, for the defendant, *Husted*, after remarking, that the sum in the hands of the clerk, expenses being deducted, would be less than the balance due on *Husted's* execution, and would of course belong to him, unless his claim was fraudulent, or unless satisfied by the trust property, contended, 1. That fraud in fact being negatived, by the finding, there was no fraud in law.   It is competent for a debtor to give his note, on demand, to his surety, for his outstanding contingent liabilities, if the payment of the debt is assumed,

expressly or impliedly, at the time, by the surety.  *Little* v. *Little*, 13 *Pick.* 426.

2. That no subsequent satisfaction has been, or can be, had from the property received in trust from *Crissey* and wife. The liens prevented a sale ; and all that *Husted* could do, was, to levy his execution on the life estate. This has been done.

*Hawley* and *Booth*, for *S. Raymond & Co.* and *Bowton*, contended, 1. That *Crissey's* note of 1125 dollars to *Husted*, was *constructively* fraudulent and void as against them. It comprised more than was due. Even the book debt was not due. The note was not only on demand, but absolute. The agreement was, that all *Crissey's* property should be taken, to be at the controul of *Husted*, whether he had his indorsements to pay, or not. Security for contingent liabilities—or indeed for any—should be security in form—showing its true character, its object and nature. *Shepard* v. *Shepard*, 6 *Conn. R.* 37. *Sanford* v. *Wheeler*, 13 *Conn. R.* 165. *North* v. *Belden*, 13 *Conn. R.* 376. The note and legal proceedings, taken together, were in effect an absolute conveyance, to secure contingent liabilities, and therefore void. 13 *Conn. R.* 381. They gave *Husted* the power to coerce immediate payment of the whole, though he might never have a cent of his indorsement to pay. Of the *understanding* between the parties, the public could know nothing. The note was, therefore, fraudulent and void *in toto*.

2. That if the note was good at all, it was good for the existing indebtedness only—not for the 180 dollars.

3. That if the note was not otherwise void, it was void within the statute against fraudulent conveyances and the additional act of 1828 ; for it embraced a *trust* for *Slosson*.

4. That *Husted* should have been ordered to sell the land conveyed to him, by *Crissey* and wife, and apply the avails. 2 *Sw. Dig.* 155. *Cheesebrough* & al. v *Cheesebrough* & al. 1 *Johns. Ch. R.* 409. *Smith* & al. v. *Hicks*, 1 *Wend.* 202. *Everston* v. *Booth* & al. 19 *Johns. R.* 486.

5. That *Husted* should be ordered to refund what he has received.

6. That by paying the one hundred dollars to *Abigail Crissey, Husted* has estopped himself to deny the sufficiency of the land to pay his claim.

STORRS, J. This is a bill of interpleader, brought for the purpose of settling the conflicting claims of the defendants to a fund in the hands of the plaintiff. The fund consists of the avails of certain personal property, which was attached by the several defendants, successively, in suits brought by them against one *Crissey*, and which was, in pursuance of an agreement between them, placed in the hands of the plaintiff, to be by him sold, and the proceeds applied to the judgments to be obtained in said suits, in the same manner as they by law would be, on the executions thereon. Judgments having been obtained, the question is, how the avails of said property shall be appropriated among the defendants.

The validity of the judgments obtained by *Raymond & Co.* and *Bowton*, the second and third attaching creditors, is not disputed. They, however, claim, that the judgment of *Husted*, the first attaching creditor, is, as to them, invalid, in whole or in part ; and that, therefore, he is entitled to no part of the avails of the property held by the plaintiff, or, if to any, to less than the amount of his judgment.

The suit, on which *Husted's* judgment was rendered, was brought on a note executed by *Crissey* to him, for the sum of 1125 dollars, payable on demand. *Crissey* being indebted to *Husted*, and *Husted* having indorsed a note for the accommodation of *Crissey*, which was negotiated and not due, said note for 1125 dollars was given for the purpose of enabling *Husted* to secure himself for such indebtedness and indorsement, by a suit to be immediately instituted, by attachment, on said note ; on which all the property of *Crissey*, including that of which the plaintiff holds the avails, was to be attached, which was accordingly done ; and the last-mentioned property was subsequently attached, by the other defendants, on suits by them successively brought against *Crissey*, on confessedly valid claims. This arrangement between *Husted* and *Crissey* was made without any fraudulent intent, on the part of either ; but there was no express agreement by *Husted*, to pay the note he had so indorsed for *Crissey*, or to indemnify *Crissey* against it ; nor any implied promise to that effect, excepting so far as the law would imply such a promise from said facts.

*Raymond & Co.* and *Bowton* claim, in the first place, that the circumstances under which the note for 1125 dollars was

HARVARD LAW LIBRARY

*Fairfield,*
June, 1843.

Ayres
*v.*
Husted.

given, invalidate the judgment on it *in toto ;* and that, there-fore, *Husted* is not entitled to any part of the fund held by the plaintiff; and, in the next place, that, if said judgment is not wholly invalid, *Husted* has a right to claim only that por-tion of it, which embraces the indebtedness of *Crissey* to him, and not that portion which embraces the amount for which *Husted* was liable as his indorser.

We think, that the judgment is clearly valid, so far as it respects the amount of such indebtedness. The consideration of the judgment is divisible ; and that part of it, which consists of the debt to *Husted,* is easily capable of ascertainment. The parties to the note are exonerated from any fraudulent intent in the arrangement which led to its execution. That part of the consideration which consists of such debt, is sound ; and we see no reason why for that the note should not be sustained. There is no principle on which a note, the consid-eration of which consists of claims, some of which are valid and others invalid, can be held, in the absence of fraud, to be wholly void. In the case of *Sanford* v. *Wheeler,* 13 *Conn. R.* 165. this court held, that a mortgage executed by the ma-ker to secure an unconditional note, payable on demand, made up of a debt due from the mortgagor, and also of a liability of the mortgagee for the mortgagor as surety, was valid as against the creditors of the latter, for the amount of the debt, although it was set aside for the remainder. That case is perhaps, in some respects, not so strong as the pres-ent, and settles this point.

But for that part of the note which consists of the liability of *Husted* as indorser for *Crissey,* we think, that, as against *Raymond & Co.* and *Bowton,* the subsequent attaching credi-tors, the judgment cannot be supported. In support of this conclusion, the cases of *Sanford* v. *Wheeler* and *North* v. *Belden,* 13 *Conn. R.* 165. 376. are relied on ; in which it was held, that a mortgage predicated on a note like the present, was invalid, against the creditors of the mortgagor, as to the amount of such liability, although valid as to the *bona fide* in-debtedness embraced in the note. It may be said, and per-haps with propriety, that these decisions proceeded on the ground that the mortgages there in question were, so far as they were set aside, deemed to be opposed to the provisions and policy of our recording laws as to conveyances of real

estate, which are not applicable to the case at bar. It is not <span style="float:right">*Fairfield,*<br>June, 1843.</span>
necessary to rely on those cases as being decisive of the
present. We think, that on principle, the note in question,
as against the other creditors of *Crissey*, must be held to be
invalid, so far as it embraces the liability of *Husted*, as his
surety, which had not been discharged by *Husted*, when the
note was given. It is unnecessary to consider whether, as
between the parties to the note, it would be deemed without
consideration, to the extent of such liability ; or whether, if the
maker had paid the amount of the note to *Husted*, to be held
for his indemnity on his indorsement, it could be disturbed in
his hands, by the creditors of the maker. The amount of
the note has not yet reached the hands of the payee. The
agreement between *Crissey* and *Husted* may, therefore, be
considered as remaining executory ; and the question is,
whether, as to the other creditors of *Crissey*, it shall be en-
forced.

It is obvious, that the tendency of an absolute, uncondi-
tional note, given merely for the security of one who has as-
sumed only a conditional liability for the maker, is directly to
delude the creditors of the maker, and to mislead them as to
his resources for the payment of his debts. It is also obvi-
ous, that it may be resorted to, as a most easy and convenient
mode by which his property may be withdrawn from his
possession, and become ostensibly that of the surety. The
transaction on its face speaks an entirely different language
from the real one ; and such transactions are always viewed
by the law with the highest degree of distrust and disappro-
bation. It has always been considered a most important
principle of public policy, especially as it regards the rights
of creditors, that the form in which contracts and conveyan-
ces are made and expressed, by which only persons other than
the parties to them are or can be usually governed, should
correspond with and be adapted to the real intention and
object of the parties. Hence it is, that the continued posses-
sion of the vendor of personal property, in pursuance of an
agreement to that effect, itself invalidates the sale as to his
creditors, except in the few cases where the law, for reasons
the most cogent, dispenses with a change of possession. And
this has been justly said to be a rule, not of evidence merely,
but of policy. *Mills* v. *Camp*, 14 *Conn. R.* 219. So, also,

<span style="float:right">Ayres<br>*v.*<br>Husted.</span>

HARVARD LAW LIBRARY

*Fairfield,*
June, 1843.

Ayres
*v.*
Husted.

it has been uniformly held, that an absolute conveyance of real estate, intended merely as a mortgage, is void as to the creditors of the grantor. This salutary principle we are not disposed to relax. There can be no good reason why the parties to contracts should not disclose in them their real intentions. Respecting the transaction now in question, no reason can be suggested why, instead of an unconditional note payable on demand, importing an absolute debt then due, the parties did not express its real design upon its face, or in some other appropriate form. It is indeed difficult to perceive how, even as between the parties to this note, much more as to the creditors of *Crissey,* the mere contingent liability of *Husted,* as indorser for *Crissey,* could form a good consideration for an absolute and unconditional promise, by the latter, to pay to the former the amount of such indorsement, on demand, so that while it remained executory, it could be enforced, although, if executed by the payment of the note, it might be retained by *Husted,* for his indemnity. A promise by *Husted* to pay or assume the debt of *Crissey,* on which he had become surety, or to indemnify him from such debt, would constitute an appropriate and valid consideration for an unconditional promise by *Crissey* to pay him the amount of such debt. Without such an obligation on the part of *Husted,* there seems to be no loss to *Husted,* or benefit to *Crissey.* If an obligation by *Crissey* to pay *Husted* according to the tenor of the note, is held to be created, while there is no corresponding obligation by the latter to pay or appropriate the money to the discharge of the debt guarantied by him, or to indemnify *Crissey* against it, the effect of the transaction would be to deprive the creditors of *Crissey* of the benefit of his property to that amount. and appropriate it to the creditors of *Husted,* which would, of course, operate as a fraud on the creditors of *Crissey.* In the present case, no such promise by *Husted* is shown. A similar view of this subject is taken by the supreme court of *Massachusetts,* in *Little* v. *Little,* 13 *Pick.* 426. where it was held, that a note payable on demand, given to a surety, is without consideration, unless he promises to pay the obligation on which he had become surety, or to indemnify the maker of the note against it ; and that even in that case, such surety can recover in an action on the note,

only such sum as he shall prove, on the trial, that he has paid on such obligation.

We think, therefore, that the note, and consequently the judgment recovered on it by *Husted,* cannot, as against *Raymond & Co.* and *Bowton,* be upheld as to the amount for which he was liable as the indorser of *Crissey.*

It is next claimed by *Raymond & Co.* and *Bowton,* that the said note and all the proceedings on it, are void, under the act against fraudulent conveyances, and also under the act in addition thereto, passed in 1828, prohibiting conveyances by insolvent debtors of their property in trust, unless for the benefit of all their creditors. It is found, that, when said note was given, it was agreed between *Crissey* and *Husted,* that if the latter could find property to attach sufficient to secure him for *Crissey's* indebtedness to him, and his liability as indorser, and also to pay a certain outstanding note due by *Crissey* to one *Slosson, Husted* should assume the payment of that note, and its amount should be allowed on the note given by *Crissey* to *Husted.* It appears, however, that the amount of *Slosson's* note was not embraced in the judgment obtained by *Husted.* To the claim that this is affected by the general act against fraudulent conveyances, it is sufficient to say, that *Husted* is entirely exonerated from any fraudulent intent in the arrangement made between him and *Crissey;* and we are not aware of any principle of law, which pronounces it fraudulent. Nor, in our judgment, is this transaction within the act of 1828. A *bona fide* agreement between *Husted* and *Crissey,* by which the former was, in a certain event, to pay the debt due to *Slosson* by *Crissey,* and reimburse himself out of the property of the latter, is not, in any sense, a conveyance or agreement in trust, either for the benefit of *Slosson* or *Husted ;* and it is neither against the letter nor spirit of that act. *Bates* & al. v. *Coe,* 10 *Conn. R.* 283.

*Raymond & Co.* and *Bowton* further claim, that *Husted* should be ordered to sell the estate conveyed to him by *Crissey* and his wife, and apply the avails to his judgment, before appropriating to the payment of said judgment any portion of the fund in the plaintiff's hands. This claim is founded on the doctrine which is supposed to prevail in courts of equity, on the subject of marshalling securities. It appears to be well established, that where one creditor has security on two

HARVARD LAW LIBRARY

*Fairfield,*
June, 1843.

Ayres
*v.*
Husted.

funds of his debtor, and another creditor has security for his debt on only one of those funds, the latter has a right in equity to compel the former to resort to the other fund, if it is necessary for the satisfaction of both creditors, provided it will not prejudice the rights or interests of the party entitled to the double fund, nor do injustice to the common debtor, nor operate inequitably on the interests of other persons. This doctrine, however, prevails only where the parties seeking aid are creditors of the same common debtor, and have demands against funds, the property of the same person. Hence, in case of a joint debt due to one creditor by two persons, and a several debt due by one of them to another creditor, if the joint creditor obtains a judgment against the joint debtors, and the several creditor subsequently obtains judgment against his several debtor, a court of equity will not compel the joint creditor to go against the funds of one of his joint debtors so as to leave the second judgment in full force against the funds of the other several debtor ; at least, it would not do so, unless it should appear, that the debt ought to be paid, by one of the debtors only, or there should be some other supervening equity, which should furnish a ground for the interposition of the court. 1 *Story's Eq. Juris.* 588.   2 *Swift's Dig.* 155. 1 *Johns. Ch. R.* 499.   4 *Johns. Ch. R.* 17.   " We have gone this length," said Lord *Eldon,* in *Ex parte Kendal,* 17 *Ves.* 520. " if *A* has a right to go upon two funds, and *B* upon one, having both the same debtor, *A* shall take payment from that fund to which he can resort exclusively, that by those means of distribution both may be paid. *That takes place when both are creditors of the same person, and have demands against funds, the property of the same person.* But it has never been said, that if I have a demand against *A* and *B*, a creditor of *B* shall compel me to go against *A*, *without more ;* as if *B* himself could insist, that *A* ought to pay, in the first instance, as in the ordinary case of drawer and acceptor, or principal and surety, to the intent that all obligations arising out of these complicated relations may be satisfied.   But if I have a demand against both, the creditors of *B* have no right to compel me to seek payment from *A*, if not founded on some equity giving *B* the right, for his own sake, to compel me to seek payment from *A*."

He accordingly refused relief where the creditors of four

surviving partners sought to have the debts of the partnership paid out of the assets of the deceased partner, so that the dividend of the estate of the survivors, who were bankrupts, might be increased in favour of their exclusive creditors, without showing that the assets of the deceased partner ought, as between the partners, to pay their debts, or that there was any other equity to justify the claim; and he says: "Indeed, there might exist an opposite equity, of compelling the creditors to go first against the property of the survivors, before resorting to the estate of the deceased partner." Chancellor *Kent* followed the same principles, in *Dorr* v. *Shaw,* 4 *Johns. R.* 17. As said by Judge *Story,* "the creditors of one of the debtors cannot, in any just sense, work out any right, except through the equity of the debtor or partner under whom their title is derived."—§ 645.

Applying these just and equitable principles to the present case, the objections to the claim we are considering, are insuperable. In the first place, the property constituting the two funds did not wholly belong to *Crissey.* One portion of it was his, and the other that of his wife. It is now sought to appropriate the latter, in preference to the former, to the payment of his debt to *Husted.* As between *Crissey* and his wife, she appears to stand in the relation of surety in the transaction before us. Her property is conveyed only collaterally for the payment of certain of his debts, and was never primarily liable for them. To appropriate her property, in the first instance, rather than his, to the payment of his debts, would, therefore, be most unjust and inequitable in itself, as well as manifestly contrary to her intentions, especially respecting the debt due to *Johnson* and *Ayres,* as is apparent on the face of the agreement executed by *Husted.* It would seem, that, as between her and those setting up this claim, her equity is decidedly the strongest. At all events, if in any case, a court of equity would compel one creditor, for the relief of another, to resort to a fund not the property of the common debtor, in preference to his, it would first require the creditor asking it to show a state of facts which would raise a decided equity in his favour, which is not done in the present case; nor would the court then so interfere, without affording the owner of the property an opportunity to be heard. But, in the next place, as to the property conveyed by Mrs. *Crissey,*

HARVARD LAW LIBRARY

*Fairfield,*
*June, 1843.*

Ayres
*v.*
Husted.

*Raymond & Co.* and *Bowton* have no superior equity to *Johnson* and *Ayres,* which it is clearly necessary for them to show, before they can claim that the latter shall be postponed. It was conveyed by her, specifically, for the benefit of *Johnson* and *Ayres;* and it is difficult to perceive why they have not at least as good, if not a better right, to require that the debt to *Husted* shall, for their benefit, first be satisfied from the property attached, than *Raymond & Co.* and *Bowton* have to require that it shall first be paid from that in which *Johnson* and *Ayres* have a specific interest, and to which *Raymond & Co.* and *Bowton* have not even the rights of general creditors. Without pursuing the subject farther, we are of opinion, that this claim is untenable; and that to sanction it would be a palpable perversion of the principle on which it is sought to be sustained.

The plaintiff is entitled to retain out of the fund in his hands the sum found to be due to him for his trouble and expenses in relation to the property attached, and also to his reasonable expenses in this suit.

The superior court is advised to pass a decree in conformity with the foregoing views.

In this opinion the other Judges concurred.