## HADDEN et al. v. DOOLEY et al.

(Circuit Court of Appeals, Second Circuit. January 25, 1899.)

No. 25.

1. BANKS—OFFICERS AS AGENTS—ACTS AGAINST INTERESTS OF BANK.

A cashier of a bank, who was also a director of a manufacturing company, and as such director assisted in promulgating false statements as to the financial condition of the company, for the purpose of defrauding all of its creditors, including the bank, was not the agent of the bank in such matter so as to affect the validity of its claims against the company.

2. FRAUDULENT CONVEYANCE—BILL OF SALE AS SECURITY—CHANGE OF POSSESSION.

A bill of sale made by a debtor to a creditor, where no change of possession takes place, but the property is permitted to remain in the possession of the debtor, and to be sold by it, is void as to other creditors.

3. INSOLVENT CORPORATIONS—POWER OF OFFICERS—TRANSFER OF PROPERTY.

A general manager of a corporation, though given by its by-laws the entire charge of its business and affairs, subject to the order and approval of its board of directors, has no power, after he knows the corporation to be insolvent and about to be placed in the hands of a receiver, to transfer the bulk of its property to one of its creditors in payment of a pre-existing debt; and such a transfer, not authorized nor ratified by the directors, is void as to its other creditors.

4. ATTACHMENT—VALIDITY—ASSIGNMENT OF CLAIM FOR SUIT.

A colorable transfer of a just cause of action against a foreign corporation by a nonresident to a resident of the state of New York, for the purpose of enabling the assignee to maintain an action by attachment thereon in the courts of the state of New York for the real benefit of the assignor, does not render an attachment obtained by the assignee void, and it cannot be attacked by junior attaching creditors of the common debtor.

5. SAME—VALIDITY AS AGAINST SUBSEQUENT ATTACHING CREDITORS.

An attachment cannot be defeated by junior attaching creditors unless there has been some element of unfair dealing which entered into the conduct of the plaintiff in taking his judgment.

6. PROMISSORY NOTES—EFFECT OF RENEWAL.

The giving of a renewal note to a bank, where it retains the original, does not discharge the precedent debt for which it is given, unless such is the agreement and intention of the parties.

7. ATTACHMENT—VALIDITY—SETTING ASIDE IN EQUITY.

A corporation had been for a number of years becoming more and more heavily indebted to a bank of which one of its directors was cashier. Notes given by the company were from time to time renewed, merely as a matter of form, and without expectation of payment, as the company was hopelessly insolvent. Finally, both the company and the bank went into the hands of receivers. Held, that an attachment thereafter obtained on behalf of the bank against the company based on such notes would not be held invalid by a court of equity, merely because the renewal notes taken for a portion of the indebtedness lacked a few days of maturity.

8. SAME—UNFAIR PRACTICE AS BETWEEN CREDITORS.

The removal and secretion of goods of a debtor by one creditor, who had an invalid bill of sale for the same, until he could obtain and levy an attachment thereon, is an unfair attempt to gain an advantage over a second creditor, who had procured an attachment, and served it on the custodian of the goods, and was engaged in securing an indemnity bond, required by the sheriff, before levying on the goods, when they were removed by the other creditors, who knew of such attempted attachment, and, as to such goods, the attachment of the second creditor will be given preference.

Appeal from the Circuit Court of the United States for the Southern District of New York.

This is an appeal from a decree fixing the priority of liens between certain attaching creditors of the Natchaug Silk Company. 84 Fed. 80.

James L. Bishop and Wm. B. Putney, for appellants.

Edward W. Paige, for appellees.

Before WALLACE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The Natchaug Silk Company was a manufacturing corporation for the manufacture and sale of silk goods, was incorporated under the laws of the state of Connecticut, and had its principal place of business in Willimantic, in that state. Its capital of $200,000, in August, 1888, was increased to $250,000 in February, 1893. J. Dwight Chaffee was its president and general manager from its organization, in 1887, and managed entirely the manufacture and sales of goods, without any oversight by the directors. The by-law of the corporation, from and after February 3, 1891, was as follows:

"The board of directors shall annually elect a general manager, who shall have entire charge of the business and affairs of said company, subject to the order and approval of the board of directors."

O. H. K. Risley was cashier of the First National Bank of Willimantic, having a capital of $100,000, was a director in the silk company, and took care of its financial business so far as the raising of money was concerned, and before 1890 the company owed the bank beyond the limit of $10,000, allowed by law. On January 1, 1890, at the suggestion of Risley, and as security for the payment of this debt, Chaffee made an ordinary absolute bill of sale to the bank of silk goods amounting to $26,610.24. These goods remained, as before, in the possession of the silk company, and were sold by it to its customers in the ordinary course of business. It was a part of the verbal agreement that the silk company could sell the goods and replace them by other manufactured goods. In the spring of 1892 the silk company owed the bank about $200,000. In January, 1894, the debt of the silk company to the bank had increased to about $300,000, and, upon request of Risley, Chaffee executed, as security for this indebtedness, two bills of sale to the bank, of manufactured goods of about $66,000 in value. Each bill contained the following statement:

"The goods represented by this bill are pledged to the First National Bank of Willimantic, as security for loans made by said bank to the Natchaug Silk Company. The Natchaug Silk Co.

"J. D. Chaffee, Prest.
"Charles Fenton, Treas."

The goods represented by these bills were placed in the storeroom and vault, respectively, of the silk company. It was said that the storeroom was built especially for this purpose, and that there were two keys, one of which was kept by Risley, who also had the combination of the vault safe. The goods were stored in the rooms or

places in which the manufactured goods of the company were ordinarily deposited, and from which they were sold and delivered as the business of the company required. The storeroom was partitioned off for a stock room about this time, but not for the especial purpose of holding goods pledged to the bank. There was also a verbal agreement that if the goods were sold by the silk company they would be replaced by other goods. There was not only no change of possession, but there was no division of the stock in these rooms between pledged and unpledged goods. A small amount (the value of which did not appear) of the goods in the two bills of sale of January, 1894, remained on hand in April, 1895. Risley died on April 12, 1895. It was forthwith discovered that both bank and silk company were insolvent, and that the silk company owed or would owe the bank, in one way and another, for notes discounted, purchased, or guarantied, about $330,000. There is no positive evidence that this state of affairs was previously not known by the directors of the bank, but it could not have been otherwise than a complete surprise. The bank examiner, who was subsequently appointed its receiver, was summoned, and, on or about April 15th, he, with some of the directors of the bank, one of whom was Fowler, also a director of the silk company, sent for Chaffee, and told him that the company must make the bank secure at once, or complete and make safe pre-existing security. Chaffee orally agreed at the time to sell to the bank the goods in the vault and storehouse, and a certain amount out of the mill, and the goods in the offices of the company in Boston, New York, Chicago, St. Louis, and Baltimore, and to ship them to D. E. Adams & Co., 77 Greene street, New York. Adams was a silk merchant, who occupied a store or office at this number, and from him the silk company leased a part of the store, where it transacted its New York business; John H. Thompson, who was also in the employ of Adams, being its manager. On April 15th, 16th, 17th, and 19th, Fenton, the secretary of the silk company, by direction of Chaffee, sent by railroad 43 cases of silk goods directed to D. E. Adams & Co. Fenton was not then told the true object of the shipment. On Monday, April 22d, Chaffee went to Boston, and sent all the silk company's goods in the Boston office—being 18 cases and a package—to Adams & Co., at the Greene street store. There were 45 cases of the silk company's goods in this store before these April shipments from Willimantic and Boston were sent. Thompson was told by letter to insure the 43 cases for the benefit of the First National Bank of Willimantic, which he did, and was also told by Adams that the Boston shipments belonged to the bank. Chaffee returned from Boston on the evening of the 22d, went to New York, and on Tuesday, April 23d, as president of the silk company, executed two bills of sale to the bank. The first was of the 45 cases theretofore in 77 Greene street, to be held for the purpose of applying the net proceeds in payment of the indebtedness of the silk company to the bank after the payment of $4,000 to Adams, for which he had a lien upon the goods. Enough of these goods were sold by Thompson to pay this lien. The second was of the goods shipped to Adams "in the name of the First National Bank of Willimantic," and were to be

held by said bank for the purpose specified in the first bill of sale, but were declared to be free from pre-existing liens. Lucas, Chaffee's attorney, who was also acting for the bank, took the documents, and subsequently delivered them to Dooley, who was appointed receiver of the bank on April 23d. When Chaffee left, on April 22d, he expected that a receiver would be appointed for the silk company. James E. Hayden was appointed on April 26th, on the application of its bookkeeper, whom Chaffee told to see Mr. Perkins, a lawyer of Hartford, if he wanted advice, and who advised a receivership. Chaffee went from New York to Chicago and Baltimore, and executed like bills of sale to the bank of the goods in those cities, and returned to Willimantic on April 29th. He called together his directors on that day, and endeavored to obtain a ratification of his acts in regard to these goods. Fenton, Wilson, and Fowler were present; Sumner, the only other living director, was absent from the state. The directors did not ratify, and no action was taken, principally on the ground that, as a receiver had been appointed, action was not expedient. Fenton was not told of the purpose of shipping the goods to New York, before April 29th. Sumner was absent. Chaffee unsuccessfully tried to find Wilson on the 22d, and wrote to Sumner, telling him what he was going to do in regard to the goods. On May 2, 1895, the 62 boxes of goods shipped from Willimantic and Boston to Greene street were removed by Mr. Paige, counsel for the receiver of the bank, and were stored in Paige's name in the storehouse of F. C. Linde & Co., in New York City, and on May 18, 1895, were removed by Mr. Paige to the Brooklyn Storage & Warehouse Company, in Brooklyn, and were stored also in his name. On May 18th, Mr. Paige, as attorney for Dooley, as receiver, commenced suit against the silk company in the supreme court of New York, and attached the 62 cases in the Brooklyn warehouse as the goods of the silk company. On May 25th, 45 boxes of silk were removed from Greene street, by Paige's orders, and placed, in his name, in the Brooklyn warehouse, and soon after were attached, by his direction, in the Dooley suit. On April 29, 1895, Morimura, Arai & Co., creditors of the silk company, obtained a warrant of attachment against it, which was served on Thompson, but no goods were taken. Thompson said that he had no goods of the silk company. Rice, another creditor, obtained an attachment on May 16th, and the sheriff, on May 18th, placed a keeper in charge of the goods in Greene street, but withdrew him upon the like representations by Thompson. On May 21st, Hadden & Co., the complainants, brought suit in the supreme court of New York against the silk company to recover a debt of $22,776.59. A warrant of attachment was served on Thompson, but the sheriff refused to take the Greene street goods until a bond of indemnity was given to protect him. This was speedily furnished, but in the meantime, on May 25th, the goods went to Brooklyn. On June 6th the goods in the Brooklyn warehouse were attached by Hadden & Co., who obtained judgment against the silk company on June 26th for $22,948.95, and execution therefor was issued, and levied on the goods in the Brooklyn warehouse. The Dooley attachment was vacated on June 27, 1895, upon the application of Hadden & Co., be-

cause the suit of a nonresident against a foreign corporation upon the cause of action set up in the complaint was not permitted by section 1780 of the Code of Civil Procedure. Adler v. Fraternal Circle (Sup.) 19 N. Y. Supp. 885. On May 31st, upon the application of Dooley, as receiver of the bank, the circuit court for the Southern district of New York authorized him to sell notes of the silk company, and a note indorsed by said company, amounting to $67,595.26, and said in the application to be "doubtful debts," for the sum of $200. Dooley thereupon, on June 1, 1895, assigned said notes to John A. Pangburn, of Schenectady. Pangburn was a carpenter, of very limited means, who had the care of 34 wooden houses in which Paige was interested. He paid no money for the notes. He authorized Paige to credit $200 of the moneys due him for the Paige estate, and Dooley credited Paige with $200. The assignment was solely for the purpose of enabling a suit to be brought by a resident of the state of New York against the silk company, a foreign corporation, and an attachment of the silk goods in the Brooklyn warehouse. It does not appear that anything was said between Paige, who acted for Dooley, and Pangburn, as to the ultimate disposition of the avails, if any, resulting from the assignment; but it is manifest that each party clearly understood that such avails would ultimately be for the benefit of the bank. On June 1st, suit was brought in Pangburn's name in the supreme court for the state of New York, against the silk company, upon the notes thus assigned, a warrant of attachment was issued, and on June 3d the goods in Brooklyn were attached. Judgment by default was obtained in favor of Pangburn on June 27, 1895, for $67,116.91, and execution was issued, which was levied upon the attached property. This bill in equity was brought on July 2d, in the supreme court of New York, to restrain the sheriff from selling these goods, and praying that the bills of sale and the liens by attachment or execution in favor of Dooley or Pangburn should be declared void and set aside. Morimura, Arai & Co., Ignatius Rice, and the China & Japan Trading Company, all judgment creditors of the silk company, were also made defendants, and filed answers. They are not appellants. A temporary injunction was issued by the circuit court for the Southern district of New York, to which the suit had been removed, against a sale under the Pangburn execution, which was subsequently dissolved, and the bill was dismissed. This action was taken under the belief that the legal questions had been decided by this court in favor of the defendants, upon an appeal from the interlocutory order granting an injunction.

Testimony was given to show that, before Risley's death, he was instrumental in submitting to the creditors of the silk company, and in lodging in the public offices in which statements were required by statute to be annually lodged, false statements of the financial condition of the silk company. This testimony was offered in support of the theory that Risley was the agent of the bank, and that the bank and the silk company had conspired to lure the creditors to sell goods to an insolvent company for the purpose of securing to the bank the fruits of the fraud. We are not inclined to believe that the bank directors knew or had reason to know of the falsity of these

statements, and are strongly inclined to believe that they were made for the purpose of universal deception, and that Risley was constantly engaged in defrauding the bank, and finally ruined it, through his attempts to keep an insolvent corporation in being by enormous unsecured advances from the funds of the bank, and by guarantying the company's notes. Risley was in no sense the agent of the bank in making false statements as a director of the silk company, for the purpose of defrauding all the creditors of the company, including the bank. This general subject has been recently fully examined in Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552. The bills of sale of 1890 and 1894 were void, as against creditors. The voluntary and unnecessary permission to a vendor of personal property to retain possession of it is conclusive evidence of a colorable sale. Colt v. Ives, 31 Conn. 25; Webster v. Peck, Id. 495. The verbal agreement of April 15th, and the bills of sale of April 23d, were not an attempt to reduce to possession goods which were theretofore pledged as security to the bank, but were in the possession of the vendor. The agreement was a new undertaking to turn over to the bank all the manufactured goods of the company, wherever situate, in part payment of, or as security for, a pre-existing debt; was made with knowledge of the insolvency of the silk company, and that it must soon be in the hands of a receiver; was made without previous authority from the directors, who, with the exception of the general manager, were ignorant of the financial situation. Upon the subject of the validity of this sale, too much stress has been given to the language of this court in affirmance of the order of the circuit court which granted an injunction pendente lite (20 C. C. A. 494, 74 Fed. 429), and too much stress was given by this court to the dicta in Lewis v. Manufacturing Co., 56 Conn. 25, 12 Atl. 637, in regard to the power of an unlimited manager of a manufacturing corporation to pay its debts in goods or personal property. The Connecticut court did not intend to consider the question of the power of such a manager over the company's entire stock of goods in the circumstances now disclosed in this case. The sale or pledge to the bank by Chaffee of the bulk of the silk company's stock of goods to a creditor upon the eve of a receivership, without the previous authority or subsequent ratification of his act by his board of directors, was ultra vires, although he was the general manager, with the powers conferred upon him by the quoted by-law, and although he had been in complete control of all the company's business except the work of borrowing money. He had power to pay a debt of a going concern, but not power to prefer creditors, by extraordinary means, when the company was about to be closed. England v. Dearborn, 141 Mass. 590, 6 N. E. 837; Dooley v. Pease, 79 Fed. 860. There was no previously expressed authority, and no ratification. The knowledge of Fowler, who was a director of the bank, was not the knowledge of the directors of the silk company, and no other director had actual knowledge before the journeys of Chaffee to the various offices of the company. There was no subsequent ratification, for when the directors were called together for that purpose they declined to ratify.

Inasmuch as the bank obtained no valid title by virtue of the bills

of sale of April 23d, the question of the rightful precedence of the Pangburn attachment over the junior attachment of Hadden & Co. remains to be considered. The Pangburn suit and attachment were based upon an absolute assignment for a nominal consideration which was paid in form; the assignment being for the purpose of enabling a suit against the silk company to be brought in the name of a resident plaintiff, for the ultimate benefit of the bank. As between Pangburn and the silk company, these facts constituted no defense to the suit or the attachment. Sheridan v. Mayor, etc., 68 N. Y. 30; Meeker v. Claghorn, 44 N. Y. 349; McBride v. Bank, 26 N. Y. 450. Such an assignment, if fraudulent, is open to attack by the creditors of the assignor, but the jurisdiction of the supreme court by virtue of such an assignment, and its power to direct an attachment, cannot be successfully attacked by the junior attaching creditors of the common debtor. They do, however, attack the validity of the attachment, as against themselves, who are also judgment creditors, upon the ground that the notes sued upon have never been owned by the bank, or, if owned, that the time of payment has been extended by renewals, which were not due on June 1st, when the suit was commenced. The subject of the power of a junior attaching creditor to attack the validity of a prior attachment of the same property by an alleged creditor, because the debt declared upon did not exist, or was not due, or because the suit was a collusive proceeding between the parties for the purpose of defrauding other creditors, has been often discussed in the state courts. In some of the states, the power is expressly conferred, and the practice is regulated by statute; in others, permission to the other creditors to appear and defend against the suit of the first attaching creditor is given by the practice of the court; and, in others, the attack is made, as in this case, by bill in equity, and the ordinary power of a court of equity is invoked. The decisions, with reasonable uniformity, declare, as a general rule, that where a senior attaching creditor has included in his judgment a claim which he knew did not exist, or has fraudulently included a claim which could not be the subject of a suit, the fraud vitiates the attachment, as against subsequent creditors, upon the ground that the fraud "corrupts and destroys the whole." Fairfield v. Baldwin, 12 Pick. 388; Page v. Jewett, 46 N. H. 441; Peirce v. Partridge, 3 Metc. (Mass.) 44; Baird v. Williams, 19 Pick. 381; Hale v. Chandler, 3 Mich. 531. But there must be some element of unfair dealing which entered into the conduct of the plaintiff in taking his judgment, in order to vitiate the attachment as against subsequent attaching creditors (Felton v. Wadsworth, 7 Cush. 587; Hathaway v. Hemingway, 20 Conn. 191); and if, in the absence of any fraudulent intent on the part of the parties to the suit, judgment is taken for a larger sum than ought to have been included in the note sued upon, it has been held that, as against subsequent attaching creditors, the judgment was divisible (Ayres v. Husted, 15 Conn. 514); and, where the attachment was issued before the maturity of the debt which was equitably due, and there was no actual fraud against subsequent creditors, "they cannot be preferred in equity, even if the suit could have been defeated by the debtor himself" (Patrick v. Montader, 13 Cal. 434).

Fourteen notes of the silk company, and a four-months renewal note of O. S. Chaffee, indorsed by the silk company, dated January 26, 1895, subsequently discounted by the bank for the benefit of the silk company, were assigned to Pangburn. Numbers 3, 4, 13, and 14 were in the possession of the bank when assigned, were never renewed, were never paid, and there is no reason to doubt their validity. All the other notes, with the possible exception of No. 8, for $5,000, were, when they were assigned, the property of the bank for value, and all are, with their renewals, unpaid. It is true that renewals were taken, but, with the exception of two assigned notes, no renewal was ever discounted, and in all cases no note, or its renewal, was ever surrendered to the maker. These renewals were given as their predecessors matured, but the entire body of notes remained in the bank, and, in pursuance of an offer of the defendants, have been deposited in court. In regard to the undiscounted renewals, when a renewal is given and the original is retained the new bill or note does not discharge the precedent debt for which it is given, unless such be the agreement of the parties. 2 Daniel, Neg. Inst. § 1259; The Kimball, 3 Wall. 37; Downey v. Hicks, 14 How. 240. But it is said that "it may well be that, by common understanding and usage, when a note is discounted by a bank to take up a prior note held by the bank against the party procuring the discount, and the avails are credited to him, the transaction is to be regarded as an extinguishment of the prior note, though it may not have been actually surrendered." Insurance Co. v. Church, 81 N. Y. 226. This remark was obiter, was not stated as a matter of law; and it is true that the discount of a new note and the crediting of the proceeds to the maker is evidence of the payment of the prior note, notwithstanding the latter remains in the bank. But it cannot be conclusive, and the question of extinguishment depends upon the intention of the parties. In the case of the two notes in question, all the subsequent renewals remained in the bank, and were never paid. The whole conduct of Risley and of the silk company plainly shows that no note, not surrendered, was ever regarded as paid by a renewal, and the method of bookkeeping which was resorted to is immaterial. There is but one assigned note which was not clearly the property of the bank at the time of the assignment, and the ownership of that note is in doubt. This doubt pertains to the note of $5,000, known as No. 8, dated January 19, 1894. An indorsement upon one of its predecessors, which was dated April 28, 1891, said that $4,000 of the note belonged to H. E. Brainerd, and $1,000 belonged to Risley. It appears to have been continuously renewed to January 28, 1895. The testimony simply leaves the ownership in some doubt. Upon such a state of facts, it would be manifestly improper for a court of equity to declare that the attachment was invalid, as against subsequent attaching creditors. It is next said that when the Pangburn suit was brought, on June 1, 1895, renewals of the notes sued on, amounting to $21,992.63, had not matured. Some of them became due June 8th, and others on June 10th. It is a general rule that a renewal note, given and accepted in renewal of a pre-existing note, suspends the right of action upon such note until the maturity and dishonor of the new note, unless

an agreement has been made that such shall not be the effect. Hubbard v. Gurney, 64 N. Y. 447.

There are in this case peculiar circumstances, which demand the attention of a court of equity. A mass of silk company notes belonged to the bank, which steadily increased in amount, and for which renewals seem to have been quite uniformly given, with no reasonable expectation of payment. A renewal was a mere form, and ordinary rules of banking seem to have been lost 'sight of. On April 26, 1895, the silk company went into the hands of a receiver, by its consent, because it was hopelessly insolvent, and from that time its control of payments of its debts ceased. The debts for which the renewal notes now in question were given were equitably the debts of the company; and to declare, by decree of a court of equity, that, under the circumstances of the case, an attachment for their security was invalid, because made a few days before their actual maturity, partakes of the character of an inequitable exercise of authority. Patrick v. Montader, 13 Cal. 434. We are the more inclined not to place the decision upon this ground because we think that the plaintiffs are entitled to adequate relief by reason of the conduct in behalf of the defendant, which was, as against the plaintiffs, inequitable. The 107 cases which were originally in the care of Thompson in Greene street, as the bank's goods, went to Brooklyn, although the exact number which went there on May 25th is not clearly stated in the record. While creditors were inquiring with a sheriff at Greene street in regard to these goods, for the purpose of attachment, they were removed from place to place by the order of Dooley's counsel, were stored in his name, and were attached, in the suit of the bank against the silk company, by his direction. The attempted attachment by the complainants of the 45 cases in Greene street was prevented by their removal to Brooklyn. The counsel for Dooley distrusted the validity of the bills of sale, and desired to secure the bank by the aid of legal proceedings. The receiver of the bank had an equal right with other creditors to take legal steps to secure its debt, but had no right to take unfair steps. The removal of the 45 cases to Brooklyn, and the storage of the property in the name of Mr. Paige, so that it could be in a measure secreted, for the purpose of preventing the complainants from completing their attachment of these cases, was an unfair step. Hadden & Co. first appeared as attaching creditors on May 21st. At this time, 62 boxes had been attached in the Dooley suit, and 45 were in Greene street. The removal of these boxes after May 21st, to prevent the completion of the Hadden & Co. attachment, was an unfair advantage in this race between creditors, and compels a court of equity to declare that the complainants should have a prior lien upon the cases which were in Greene street when the sheriff's bond was being prepared. There is no apparent equity in giving priority to their attachment upon 107 cases, but they are entitled only to a prior lien upon the goods which they attempted to attach,—an attempt the success of which was foiled by a removal of the goods.

Decree of the court below should be reversed, with costs of this court, with instructions to decree priority of lien to the complain-

ants upon the 45 boxes of goods, to the extent of their judgment, interest, and costs, and to decree to them such further relief, by way of a sale or an accounting, as may be necessary. The ultimate disposition of the renewal notes, which were deposited with the clerk of the circuit court, will undoubtedly be made apparent upon the settlement of the receivership, and they can remain in the custody of the circuit court until its further order. The cause is remanded to the circuit court, with instructions to take further proceedings, and to enter a decree not inconsistent with the foregoing opinion.

WALLACE, Circuit Judge. I will briefly state the reasons for my concurrence in the opinion of Judge SHIPMAN. The case resolves itself into a question of priority of liens between judgment creditors of the Natchaug Silk Company having executions levied upon 107 boxes of silk in the storehouse of the Brooklyn Storage & Warehouse Company, and its decision depends upon the priority of the liens acquired by the attachments in the actions in which judgments were recovered. For the reasons fully stated by Judge SHIPMAN, the title to these goods, at the time they were removed to the storehouse from New York City, was, as against the creditors of the silk company, still in that company; the transfer from the company to the bank being fraudulent, and that made by Chaffee, its general manager, when it was moribund, being ineffectual, in the absence of express authority from, or subsequent ratification by, the directors. Of these goods, 45 boxes were removed by Dooley, the receiver of the Willimantic Bank, and stored in Brooklyn clandestinely, for the purpose of defeating a levy upon them under the attachment in the complainants' action until Dooley could procure an attachment and levy upon them through the instrumentality of Pangburn. A creditor having property of a debtor in his possession or under his control cannot thus defeat the rights of another creditor who has been in the meantime using proper diligence to attach it. A race of diligence between creditors is legitimate, but it cannot be won by the abuse of legal remedies. I cannot doubt that the complainants could recover of Dooley in an action on the case, for his acts in frustrating their attempted levy. A court of equity, under such circumstances, should postpone his lien to theirs.

Because the attachment in the Pangburn suit was valid, its lien cannot be displaced in favor of the complainants, as respects the goods removed before their attachment was obtained. The Pangburn suit was a proceeding by Dooley, the receiver of the bank, to procure an attachment against the silk company, which could not have been procured in an action in his own name, and by means thereof to levy upon the goods before other creditors of the silk company could do so. Although Pangburn was only a dummy, it was not a fraud upon the statutes of New York, nor upon creditors, for Dooley to make a formal assignment of the demands of the bank to a resident of New York, and prevail upon him to bring an action and obtain an attachment. An attachment could not have been obtained in an action brought by a nonresident against a foreign corporation, but what Dooley did was a legitimate device for obviating the difficulty. Mc-

Bride v. Bank, 26 N. Y. 450; Petersen v. Bank, 32 N. Y. 47. The lien is doubtless to be regarded as a lien obtained by Dooley, because the suit and attachment were, in everything but name, a suit and attachment by Dooley. The attachment cannot be defeated upon the ground that Pangburn did not have a valid right of action for the full amount of the claim against the silk company. The bank had an honest debt against the silk company for the demands assigned to Pangburn; and, this being so, it is immaterial whether the silk company could have defeated the action in part by interposing the defense that there were outstanding notes in renewal of some of those assigned. It did not do so; and, as it was under no moral obligation to attempt to defeat the collection of a just debt, creditors cannot be heard to complain. It had the right, if it chose, to permit Dooley to obtain a preference over its other creditors; and, if it had surrendered the outstanding notes to Dooley, to enable him to sue upon the original consideration, there would have been no legal wrong in doing so. If it appeared that the claims assigned were pretended claims, the attachment would be merely colorable, and the lien void, as against the complainants as attaching creditors. As it is, it is valid. The theory that the lien of Dooley, as receiver of the bank, should be postponed to that of the complainants because of a conspiracy between the bank and the silk company to defraud the complainants and other creditors, is too nebulous, upon the proofs, for practical consideration.